942 A.2d 812 (2008)
398 N.J. Super. 574
STATE of New Jersey, Plaintiff-Respondent,
v.
Douglas NOBLE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 11, 2008.
Decided March 13, 2008.
*814 Kristin Muir, Designated Counsel, argued the cause for appellant (Yvonne *815 Smith Segars, Public Defender, attorney; Robert J. Kipnees and Thomas W. McDonald, on the brief).
Jason F. Statuto, Assistant Prosecutor, argued the cause for respondent (James F. Avigliano, Passaic County Prosecutor, attorney; Mr. Statuto, of counsel and on the brief).
Before Judges PARRILLO, GILROY and BAXTER.
The opinion of the court was delivered by
BAXTER, J.A.D.
This appeal presents the question of whether the State may, consistent with a defendant's right to remain silent, cross-examine him on the late filing of his alibi notice when such cross-examination is designed to highlight inconsistencies between the alibi notice and defendant's trial testimony a mere two days later. We conclude that here, where the cross-examination on the timing of the alibi notice served to demonstrate the unlikelihood that defendant's recollection of the facts supporting his alibi defense would change so significantly in a two-day period, the State's cross-examination did not constitute a prohibited evisceration of defendant's right to remain silent.

I.
Defendant Douglas Noble appeals from his conviction on a charge of first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3.[1] The judge sentenced him to a sixteen-year term of imprisonment, of which eighty-five percent was ordered to be served without eligibility for parole in accordance with the provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Appropriate fines and penalties were imposed.
On appeal, defendant presents the following arguments for our consideration:
I. NOBLE'S CONVICTION MUST BE REVERSED BECAUSE PERVASIVE PROSECUTORIAL MISCONDUCT RENDERED HIS TRIAL FUNDAMENTALLY UNFAIR. (NOT RAISED BELOW)
A. THE PROSECUTOR'S REPEATED REFERENCES TO THE TIMING OF NOBLE'S ALIBI NOTICE EVISCERATED NOBLE'S FUNDAMENTAL RIGHT TO REMAIN SILENT AND DIRECTLY CONTRAVENED DEATORE AND ITS PROGENY.
B. THE PROSECUTOR ENGAGED IN NUMEROUS ADDITIONAL INSTANCES OF MISCONDUCT WHICH, PARTICULARLY WHEN VIEWED CUMULATIVELY AND IN COMBINATION WITH THE IMPROPER USE OF THE TIMING OF NOBLE'S ALIBI NOTICE, REQUIRE REVERSAL OF NOBLE'S CONVICTION.
II. NOBLE'S CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT FAILED TO CHARGE THE JURY WITH THE LESSER-INCLUDED OFFENSE OF ATTEMPTED PASSION/PROVOCATION MANSLAUGHTER. (RAISED BELOW)
III. NOBLE'S SENTENCE MUST BE VACATED BECAUSE THE TRIAL COURT FAILED TO ESTABLISH ITS BASIS IN APPLYING AN AGGRAVATING FACTOR AND DID *816 NOT APPLY SEVERAL MITIGATING FACTORS THAT WERE ESTABLISHED BY THE EVIDENCE ON RECORD. (RAISED BELOW)
We affirm.

II.
These were the facts presented at trial. The victim, Paul Smith, married defendant's sister, Yakisha Noble, in the spring of 2003. At the time of their marriage, Yakisha already had an eleven-year-old daughter from a previous relationship. In April 2003, shortly after the marriage, Yakisha's daughter accused Smith of sexually assaulting her. In response to her allegations, the Passaic County Prosecutor's Office began an investigation.
On April 30, 2003, Smith went to the Passaic County Prosecutor's Office because he was "scared for his life" as a result of threats that had been made by defendant, defendant's brother Dante Noble and an individual named Aaron. The prosecutor's office advised Smith that he should inform the Paterson police of his fears because the prosecutor's office was dealing only with the child abuse allegations.
One month later, on May 29, 2003, defendant's brother Dante forcibly took Smith to the Nobles' mother's house where Dante confronted Smith about the sexual abuse allegations that Yakisha's daughter had made. Smith testified that defendant was in the backyard of the house and he heard defendant say to Dante, "You should have come and got me, I would have killed him." After that incident, Smith went to the police and filed charges against Dante, who was arrested and charged with kidnapping.
On Wednesday, June 4, 2003, six days after Dante was arrested for kidnapping Smith, Smith left his apartment in Paterson shortly after 8:00 p.m. It was dusk, but the area was illuminated by a street lamp. As Smith was walking, a red car pulled up along aside him. Smith heard someone shout out his name, "Paul." When Smith turned around, he saw defendant get out of the passenger seat of the vehicle and walk toward him. Smith saw defendant carrying an object "like a bat or a pipe." According to Smith, defendant said "You pressed charges on my brother. Either you drop them or you go to the morgue." Defendant then swung "the bat" and smashed Smith on the left side of his head, causing him to lose consciousness.
At approximately 8:51 p.m. that night, two Paterson police officers were dispatched to a call regarding an injured man. Officer Steven Leishman testified that when he arrived at the scene of the incident, he saw a man who was badly beaten and bleeding profusely from his head. The man was subsequently identified as Paul Smith. Covered in blood, Smith kept repeating "I can't see." Leishman testified that Smith was not in any condition to give a detailed statement. Leishman did, however, ask Smith who attacked him. Smith's reply sounded to Leishman like, "Don Mobley." Leishman described Smith as "very incoherent" and "pretty much mumbling." The prosecutor's office conducted an investigation and ascertained that there was no one named Don Mobley in the county or surrounding area. At trial, Smith testified that he told Leishman that his assailant was Doug Noble and that he never said Don Mobley.
Detective Steven Sela of the Paterson police department testified that he and another detective spoke with Smith at the hospital on June 9, 2003. Based upon Smith's statement that he was assaulted by his brother-in-law Douglas Noble, Sela prepared a complaint charging Noble with attempted murder. According to Sela's testimony, there was "no hesitation, equivocation, *817 uncertainty or doubt voiced by Smith" when he told Sela that it was defendant who assaulted him. Sela canvassed the neighborhood where the attack took place, but was unable to find any witnesses. Defendant was not apprehended and arrested on the attempted murder complaint until July 29, 2003.
The State also presented the testimony of Dr. John A. Schultz, the surgeon who operated on Smith the night of the assault. Schultz testified that as a result of the attack, Smith suffered nine different fractures to his head, including fractures to the bones around both eyes, his nose, and his jawbone. The attack left Smith blind in both eyes, partially deaf, and without a sense of taste or smell.
Trial was scheduled to begin on May 17, 2005. At a pretrial conference on May 16, defendant stated for the first time that his wife Chenita Noble would be presented as an alibi witness. The judge directed defense counsel to prepare an alibi notice, have defendant sign it and provide it to the State. The alibi notice that was filed on May 17, the day the trial began, stated that defendant was talking with his sister on the telephone from his home in East Orange between 8:00 and 8:20 p.m. on the night in question. The notice also specified that after the phone call ended, defendant drove his wife to her Bible study class in East Orange.
Defendant testified at trial. On direct examination, he denied that he had beaten Smith and maintained that he was not in Paterson on the night in question. He also testified that on Wednesday nights, his wife attended Bible study classes and she liked to be punctual. According to defendant's initial version at trial, at approximately 8:00 p.m. on June 4, 2003, his sister Shirley Noble called and he and his wife both spoke with her. The telephone conversation lasted for twenty to forty-five minutes. After the phone call concluded, he drove Chenita from their home in East Orange to her Bible study session, which was also located in East Orange approximately ten to fifteen minutes away. They arrived at the study session at 8:38 p.m. According to defendant's testimony, he returned home after dropping her off and did not leave the house again until he went to pick her up shortly before 9:30. According to defendant, he did not stop anywhere either on the way to Bible study or on the way back.
The prosecutor began his cross-examination by asking defendant a series of questions about when defendant furnished his alibi notice to the State:
Q. The second page indicates when it was dated, which would be the day it was prepared, the day it was signed and it was given to the State. What was the day that this alibi notice was given?
A. It says May 17, 2005.
Q. Okay. Now today is the 19th, correct?
A. Yes.
Q. So the 17th would have been Tuesday, is that correct?
A. Yes.
Q. Does that sound right to you, that it was Tuesday morning that you had signed it and we had gotten it?
A. Yes.
Q. Okay. That was the day we actually started jury selection and gave our opening statements in this case, correct?
A. Yes.
Q. The day before that, Monday, Monday afternoon is when we started doing the pretrials, discussing this case before we sent for a jury panel, is that correct?
A. Yes.

*818 Q. And that was when you first gave information that you had alibi witnesses, correct?

A. No.

Q. You had given that previous?

A. Yes.

Q. Not to Mr. Uhlik, correct?

A. To Mr. Fusco.

Q. Okay. Not to Mr. Uhlik, is that correct?

A. Not to Mr. Uhlik, you are right.

[(emphasis added).]
In response to the prosecutor's question, defendant agreed that his alibi notice stated he was at home until 8:20 p.m., at which time he left the house to drive his wife to her Bible study class. He also acknowledged that because his wife never wanted to be late for Bible study, which began at 7:30 p.m., they needed to leave the house no later than 7:15 p.m. For that reason, he stated that his alibi notice may have been incorrect, and that the phone call had probably started at 7:30 p.m. Next, the prosecutor questioned him concerning his insistence at an earlier point in cross-examination that the phone call started at 8:00 p.m. The cross-examination continued as follows:
Q. So if you got off [the phone] about 8:20, if it was a minimum of twenty minutes, the phone rang at 8:00, right?
A. Minimum, yes.
Q. And that couldn't be the case because your wife would have been at Bible study a half hour before?
A. Yes.
Q. If [the conversation lasted] the forty-five minutes on the outside, that phone call came in at about quarter of eight, right?
A. It could have. It could have.
Q. But the problem with that, your wife would have already been at Bible study for fifteen minutes.
A. That's true. So maybe it came before then.
. . . .
Q. Why would she say, Oh, in case the phone rings tonight, I'll just stay and miss Bible study because maybe the phone is going to ring? Is that what you're telling us?
A. No.
Q. So she wouldn't know the phone was going to ring that particular evening, correct?
A. Okay, you are probably right. You are probably right.
With that, the cross-examination of defendant concluded.
Defendant's wife also testified as an alibi witness. Her testimony on cross-examination about when the call from Shirley started contradicted her testimony on direct.
Of even greater significance, she insisted during her testimony that the phone call occurred on June 4, 2003, but also acknowledged that two days earlier, when she was interviewed by Detective Woods and the prosecutor about her alibi testimony, she had told them that the phone call from Shirley took place at "the end of June, beginning of July." She explained that the reason she believed it was the end of June was because her children never left New Jersey to visit their father in Bermuda until the school year was over at the end of June. She added that the children usually went to Bible study with her, "[b]ut this particular night, there's no question the children did not go with me." She agreed that the reason the children had not gone with her to Bible study that night was "because they were already in Bermuda." The prosecutor then pressed *819 her further about her conversation with him and Woods two days earlier:
Q. Okay. Now, that was just two days ago, right?
A. Yes.
Q. Now Ms. Noble, two days ago, you told Detective Woods and I that you were sure it was either the end of June or more likely early July. Now you are telling the ladies and gentlemen June 4. Do I have that correct?
A. Yes.
Q. That's off by about a month, correct?
A. A month, yes.
. . . .
Q. Ms. Noble, in the last forty-eight hours, what caused you to change from late June or early July to specifically June 4?
A. The date, it didn'tit
I had the wrong date.
Q. You had the wrong month, correct?
A. The wrongyes.
Shirley Noble also testified as a defense witness. She maintained that she telephoned her brother at his home in East Orange on June 4, 2003. On cross-examination, she acknowledged that when she had spoken to the assistant prosecutor and the detective two days earlier, she was unable to remember whether the phone conversation had occurred at the beginning, middle or end of June, yet "today [she was] certain it was June 4."
During his summation, the prosecutor provided numerous reasons why the alibi testimony of both Shirley Noble and Chenita Noble should be disbelieved, commenting upon the testimony that we have described. He then turned to a discussion of defendant's testimony and stated, "Then there is the defendant's testimony. He statedwe went through his alibi notice which was signed the day after we started the case." The prosecutor argued at considerable length why defendant's alibi testimony was not believable, but he never again referred to the late furnishing of the alibi notice, nor did he ever ask the jury to draw any inferences from that fact.
During the charge conference, the judge expressed his intention to charge the jury on alibi, but with one modification. He read the proposed charge to both parties, and both expressed approval. When the judge charged the jury, he gave the alibi charge that he had discussed during the charge conference. In relevant part, the judge stated:
The defendant, Douglas Noble, and a defense witness, Chenita Noble, testified to the defendant's whereabouts at the time of the alleged crime, placing him at someplace other than the scene of the crime. You may consider evidence concerning when the defendant, Douglas Noble, or the Defense witness, with information as to the defendant's whereabouts at some place other than the scene of the crime, came forward and why he or she did so at that particular time.

However, this is another place where evidence is allowed only for a limited purpose. When you are considering this evidence with regard to the timing of when a person came forward with this information, this evidence is allowed only for the limited purpose of affecting the credibility of that particular person's testimony. So, that's the limited purpose for which it is allowed and it must not be used for any other purpose.
You may not use the evidence to conclude that the defendant, Douglas Noble, or the witness, violated some obligation to come forward, because neither the defendant nor the witness had any *820 duty to speak on the subject with anyone.
If after a consideration of all the evidence, including the evidence of defendant's whereabouts at the time of the offense, you have a reasonable doubt as to whether he committed the crime, you must find the defendant not guilty.
If, however, after considering all of the evidence, you are convinced beyond a reasonable doubt of the defendant's presence at the scene of the crime and have concluded that the State has proved each element of the offense charged in the indictment beyond a reasonable doubt, then you must find the defendant guilty.
[ (emphasis added).]
Defendant did not object to any portion of the alibi charge. The jury deliberated and reached the verdict we have described.

III.
In Point I(A) of his brief, defendant argues that the prosecutor's repeated references to the timing of his alibi notice "eviscerated" his right to remain silent and denied him a fair trial. Because defendant did not object to this testimony at trial, his claim on appeal must be evaluated under the plain error standard of review. R. 2:10-2. We may reverse on the basis of unchallenged error only if we find the error was "clearly capable of producing an unjust result." Ibid.
Defendant contends that the prosecutor's explicit reference to the date on which he signed the alibi notice and its proximity to the beginning of the trial "leave no doubt as to [the prosecutor's] motive: to penalize [defendant] for exercising his right to remain silent by improperly casting doubt upon the credibility of his alibi testimony."
In particular, defendant argues that the prosecutor's references to the timing of his alibi notice violate State v. Deatore, 70 N.J. 100, 358 A.2d 163 (1976). There, the Court held that it was error for a prosecutor to elicit testimony concerning the defendant's failure to provide alibi information to the police "at the first opportunity." Id. at 115, 358 A.2d 163. The Court held that because a defendant has a right to remain silent at the time of arrest, his silence and failure to supply an alibi at that time is protected. Ibid. Accordingly, the Court held, questions directed to the failure to furnish the alibi to police at the time of arrest impermissibly erode a defendant's right to remain silent. Id. at 117, 358 A.2d 163.[2] Defendant also relies upon our decisions in State v. Sutton, 237 N.J.Super. 221, 567 A.2d 272 (App.Div. 1989) and State v. Aceta, 223 N.J.Super. 21, 537 A.2d 1317 (App.Div.1988).
The State, in turn, argues that "when a defendant makes the voluntary decision to assert an alibi defense and files a notice of alibi, the information contained in that notice [is] subject to cross-examination." The State maintains that when a defendant chooses to testify regarding his alibi defense, the State is entitled to cross-examine him on the inconsistencies between his trial testimony and the contents of his alibi notice in order to demonstrate that his trial testimony is not worthy of belief.
Specifically, the State argues that because a mere two days elapsed between the time defendant furnished the alibi notice and the time he testified at trial, such a brief period of time becomes highly relevant *821 to a jury's evaluation of the credibility of a defendant's alibi trial testimony. This is so, the State maintains, because of the unlikelihood that a defendant's recollection of his whereabouts at the time of the crime would change significantly in a two-day period. Relying on State v. Irving, 114 N.J. 427, 440-41, 555 A.2d 575 (1989), the State argues that such an approach constitutes a "litigational" use of a late alibi notice and does not constitute an attack on a defendant's right to remain silent that the Court prohibited in Deatore. We agree.
In Irving, the Court held that the State is permitted to cross-examine a defendant about the content of his alibi notice without violating a defendant's right to remain silent. Id. at 436, 440-41, 555 A.2d 575. As the Court observed:
[I]f an alibi should tend to incriminate an accused, it must be because of its inherent infirmity. The Constitution does not protect a defendant from the consequences of a defense he makes, nor assure him a right so to defend as to deny the State a chance to check the truth of his position.
[Id. at 434, 555 A.2d 575 (quoting State v. Angeleri, 51 N.J. 382, 385, 241 A.2d 3 (1968)).]
In State v. Sutton, 237 N.J.Super. 221, 225, 567 A.2d 272 (App.Div.1989), the State sought to rely on the Court's opinion in Irving. Specifically, the State asserted that the judge's charge on the lateness of defendant's alibi notice did not constitute a "direct" attack on defendant's right to remain silent, but was instead a "litigational" use of the notice of alibi "countenanced" in State v. Irving. Ibid. We rejected the State's argument and agreed with the defendant that the jury charge in Sutton did not constitute the "litigational" use of the notice that the Court approved in Irving because the State never cross-examined the defendant about the "contents" of his alibi notice, and instead only addressed its "lateness." Id. at 228, 567 A.2d 272. We reasoned:
This was a flat comment on the failure of defendant to name [his alibi witness] earlier and is entirely different from a case like Irving in which the information contained in the notice is the subject of the comment or examination. The reason there was no such comment here is that [the witness's] evidence was not different from that of [defendant] whereas in Irving the late alibi notice contained substantively distinct information. This kind of comment by the judge was specifically identified in Aceta as falling within the scope of its prohibition. There we noted that "the violation [of defendant's privilege against self-incrimination] was compounded by the questioning of the trial judge . . . as to defendant's failure to have disclosed his alibi defense during any of his pretrial court appearances." In short, the trial judge's charge to the jury was an improper comment on defendant's exercise of his right to remain silent under Aceta, as a result of which a reversal is warranted.
[Ibid. (citation omitted).]
Our careful review of the record demonstrates that defendant's right to remain silent was not violated here because the prosecutor did not use the timing of the alibi notice to suggest defendant had fabricated it. We agree with the State's contention that the prosecutor used the timing of the defendant's alibi notice to highlight the obvious fact that the factual assertions contained in the notice were inconsistent with defendant's trial testimony that took place just two days later.
The prosecutor did not suggest in his cross-examination that defendant had an obligation to come forward with exculpatory *822 information, but instead, as the State argues, "focused on the importance of the timeline in the notice as it pertained to defendant's trial testimony." During cross-examination, the prosecutor's questions forced defendant to agree that critical information contained in his notice of alibi, namely what time it was when he was at home on the phone with his sister, was incorrect. Therefore, the prosecutor properly used the timing of defendant's alibi notice to lay the foundation for cross-examining defendant about the inconsistencies between his trial testimonythat the phone call started before 8:00 p.m.and the alibi notice furnished two days earlier in which he claimed the phone call did not begin until 8:00 p.m.
Our conclusion that the cross-examination concerning the timing of defendant's notice of alibi was used "litigationally," as permitted by Irving, and did not constitute an impermissible comment on defendant's exercise of his right to remain silent, is strengthened by a comparison of the facts here with those of Aceta, on which defendant relies. There, we concluded that the State's attack upon the defendant's failure to have previously disclosed his exculpatory alibi defense "was so flagrant a violation of defendant's right to remain silent" that his conviction could not stand. Aceta, supra, 223 N.J.Super. at 28, 537 A.2d 1317.
In Aceta, the defendant did not submit his alibi defense until three days before trial began, id. at 27, 537 A.2d 1317, which was seventeen months after his arrest for shooting two police officers. During cross-examination, the prosecutor asked the defendant whether "for a year and a half [he] just sat on this alibi." Id. at 26, 537 A.2d 1317. During his summation, the prosecutor commented that the defendant's defense was "the eleventh hour alibi defense." Ibid. He went on to argue that the situation was similar to "a baseball game, [where] it is now the bottom of the ninth. There is two outs and he is way behind." Id. at 27, 537 A.2d 1317. The prosecutor continued:
[If] he is going to beat this charge, he'd better get to the plate and start hitting a lot of homeruns because he got a lot of crown [sic], lot of runs to make up in this case, so now he is going to get up . . . to tell you . . . his side of the story . . . which he forgot or neglected or somehow was unable to tell the State for the seventeen months he has had these various serious charges over his head. . . .
[Ibid.]
The State in Aceta did not seek to defend its cross-examination of the defendant by arguing that such testimony established inconsistencies or other reasons why his trial testimony was not true. Instead, the State defended its cross-examination of defendant by arguing that defendant's right to remain silent was not violated by the prosecutor's trial tactics. Ibid. Accordingly, when the facts here are compared to the facts of Aceta, it becomes clear that the cross-examination of defendant here about the late furnishing of his alibi notice suffered from none of the infirmities presented there. Here, the prosecutor never argued that defendant's alibi was untrue because he waited so long to furnish it. The "flagrant" violation that we found in Aceta is plainly absent here.
Our conclusion that the State's cross-examination of defendant did not violate his right to remain silent, and did not constitute a Deatore violation, is consistent with the Court's decision in State v. Muhammad, 182 N.J. 551, 868 A.2d 302 (2005). There, the Court held that the State is entitled to let the jury know of the "stark contrast" between the defendant's first account of the alleged incident and the way the defense describes that incident *823 at trial. Id. at 566, 868 A.2d 302. What is not permissible, however, is suggesting that the jury should reject the proffered defense because the defendant "remained silent when he had the opportunity to present it to the police." Ibid. The Court reasoned, "In other words, the prosecutor impaled defendant on his silence, intimating that an innocent man would not have stopped speaking to the police officers, but would have revealed to them the defense offered as truth at trial." Id. at 566-67, 868 A.2d 302.
Here, the State's cross-examination of defendant demonstrated the "stark contrast" between the version of the alibi defense defendant presented in his alibi notice and the version he presented two days later in his trial testimony. The timing of defendant's alibi notice was used by the State here only to discredit defendant's trial testimony by highlighting that "stark contrast" in so short an interval. Unlike in Muhammad, the State never "impaled" defendant on his failure to furnish the notice at an earlier opportunity. Thus, the Deatore violation that the Court identified in Muhammad, id. at 565-66, 868 A.2d 302, is absent here.
We accordingly conclude that neither the cross-examination of defendant about the timing of his alibi defense nor the prosecutor's comment in his summation concerning that same subject eroded defendant's right to remain silent. This is especially so in light of the judge's instruction to the jury on the limited use of the evidence concerning the timing of defendant's alibi notice. Even if, for the sake of argument, we were to conclude that such comments were error, we would nonetheless conclude that they were not clearly capable of producing an unjust result. Our review of the record causes us to conclude that the jury's rejection of defendant's alibi resulted not from his delay in asserting it, but from the numerous inconsistencies in the testimony he, his wife and his sister provided.
As we have described, his sister Shirley Noble testified that the phone call could have been made as early as 5:30 p.m., whereas the alibi notice stated that the conversation did not begin until 8:00 p.m. In his testimony, defendant contradicted his own alibi notice when he insisted that the call had probably been made much earlier than 7:30 p.m. because if it had come after 7:30 p.m., he and his wife would already have left for her Bible study session. Additionally, defendant's sister acknowledged that when she had spoken to an investigator two days before she testified at trial, she had told the investigator that she was unsure whether the phone call was in June or July. Yet in her trial testimony, she was certain the phone call took place on June 4.
Moreover, defendant's wife told an investigator two days before the trial that she believed the phone call was in late June or early July because she was certain that her children were already in Bermuda at the time the phone call was made, yet at trial she insisted that the phone call had occurred on June 4. These overwhelming inconsistencies were no doubt fatal to the credibility of defendant's alibi. We thus conclude that the jury likely rejected the alibi defense because the details surrounding it were simply not credible, and not because of defendant's delay in asserting that defense. This being so, any error, if there was one, was not clearly capable of producing an unjust result. See R. 2:10-2.

IV.
In Point I(A) of his brief, defendant also argues that the prejudice that resulted from the prosecutor's questioning about the timing of his alibi notice was compounded by the erroneous jury instruction *824 the judge gave on that subject. In particular, he points to the portion of the instruction where the judge told the jury that it was entitled to consider evidence concerning when defendant came forward with an alibi defense.
We note that the judge also instructed the jury that such evidence could be used only for the "limited purpose" of evaluating the credibility of defendant's testimony and could not be used for any other purpose. The judge specifically prohibited the jury from using the evidence of any such delay to conclude that defendant violated some obligation to come forward because the defendant had no duty "to speak on the subject with anyone."
Because defendant did not object to the charge at trial, we consider it under the plain error standard of review. "Plain error in the context of a jury charge is `[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Brown, 190 N.J. 144, 160, 919 A.2d 107 (2007) (quoting State v. Torres, 183 N.J. 554, 564, 874 A.2d 1084 (2005)). We must read the charge "as a whole in determining whether there was" plain error. Ibid.
Reviewing the charge as a whole, we find no plain error. Although we agree that the judge inadvertently misspoke[3] when he instructed the jury that it was free to consider the timing of defendant's assertion of an alibi defense, the charge as a whole did not have a clear capacity to bring about an unjust result. This is so for two reasons. First, the judge instructed the jury that: the State bore the burden of proving that defendant committed the offense and was present at the time and place the crime was committed; the lateness of defendant's alibi notice could only be used for a "limited purpose"; defendant had no burden of proof with respect to his alibi defense; and defendant had "no duty to speak on the subject with anyone." Considering the charge in its entirety, as we are required to do, ibid., *825 we conclude that the jury was not misled by this isolated mistake on the judge's part.
Second, for the reasons we discussed in Part III, we conclude that the jury's rejection of defendant's alibi defense likely had nothing to do with defendant's delay in asserting it, but instead resulted from the implausibility of the defense itself in light of the actual testimony provided by defendant, his wife and sister on that subject. Thus, the error by the judge did not lead the jury to a result it would not otherwise have reached.

V.
In Point I(B) of his brief, defendant argues that the prosecutor engaged in numerous additional instances of misconduct which, when viewed cumulatively and in combination with the improper use of the timing of defendant's alibi notice, require reversal. We have considered defendant's arguments in light of the record and applicable law, and conclude they lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2).

VI.
In Point II of his brief, defendant argues that the trial court committed reversible error by failing to sua sponte charge passion/provocation attempted manslaughter. We disagree.
We note that in his point heading, defendant argues that this error was raised below. He is mistaken because, as we have already discussed, defendant did not object to any portions of the judge's charge at the time it was given. His arguments respecting the failure to give such a charge have been raised for the first time on appeal.[4]
Because defendant did not object to the jury charge before the jury retired to deliberate, we will reverse only if the failure to charge the jury on passion/provocation attempted manslaughter was plain error "clearly capable of producing an unjust result." R. 2:10-2. Not any possibility of an unjust result will suffice. The possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
In support of his argument, defendant contends that "if he was responsible for Smith's assault, he was responding to his recent discovery of a continuing and horrific pattern of sexual abuse perpetrated upon a close family member, which might continue if left unchecked." Thus, defendant argues, there was sufficient evidence in the record that the judge was required to charge the jury on the lesser-included offense of passion/provocation attempted manslaughter even though he failed to make such a request.
The judge is not required to provide the jury with an instruction on a lesser-included offense sua sponte unless "the facts clearly indicate the appropriateness of that charge." State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985). There is no onus placed upon the trial court to "on its own meticulously . . . sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain" a murder charge. Ibid.
*826 The offense in question is a lesser-included offense of attempted murder. State v. Robinson, 136 N.J. 476, 489, 643 A.2d 591 (1994). Passion/provocation manslaughter has four elements: "the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). The first two elements are objective, and the last two are subjective. Ibid.
In determining whether to give a passion/provocation instruction, a trial court should look at the evidence in a light most favorable to defendant. Id. at 412, 568 A.2d 879. The first element of adequate provocation addresses "whether [or not] loss of self-control is a reasonable reaction." Ibid. "If no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person, the trial court should withhold the charge." Ibid.
The second element looks at the cooling off period. Despite the existence of adequate provocation, "a charge of passion/provocation manslaughter is not available if [defendant] should have cooled off before the killing." Id. at 412-13, 568 A.2d 879. The Court declined in Mauricio to specify particular temporal guidelines, and chose instead to permit the trial judge to develop a "sense of the situation as disclosed by the facts." Id. at 413, 568 A.2d 879.
As we have observed, the third element is whether the perpetrator's passions were inflamed, and the fourth looks at whether his or her passions actually did cool. Ibid. Both of these elements are subjective and should be left to the discretion of the jury. Ibid.
Here, even if we were to assume that Smith's assault upon defendant's sister's daughter outside of defendant's presence can be considered an adequate provocation, we agree with the State that defendant's argument still must fail because there was more than an adequate cooling-off period based upon the undisputed facts in the record. The sexual assault upon defendant's sister's daughter took place more than a month before defendant's attack upon Smith. During that month, the sexual assault was reported to the police and the prosecutor's office opened an investigation. Even if we were to assume that defendant was unaware of the allegations against Smith until the kidnapping incident on May 29, 2003, he still waited six days before he drove to the victim's home and struck him in the head with a baseball bat.
Furthermore, we agree with the State's contention that "defendant's statements at the scene and his subsequent trial testimony contradict his belated assertion that the motivation for the assault was the sexual assault upon his niece." Smith testified that moments before he was attacked, defendant said "you pressed charges on my brother, either you drop them or you go to the morgue." We agree with the State that this threat clearly suggests that the assault on Smith was retribution for Smith having pressed charges against defendant's brother Dante, and not an impassioned response to the sexual assault upon a family member. Thus, the record does not support defendant's contention that the provocation was Smith's sexual assault on defendant's niece.
Moreover, during defendant's own trial testimony, he maintained that he never struck Smith and that he was not even in *827 Paterson the night of the attack. Thus, the State is correct when it argues that regardless of whether the trial judge credited either the victim's account of the facts or the defendant's, neither version supported the elements of passion/provocation attempted manslaughter.
Accordingly, we are not satisfied that the omission of such a charge led the jury to a result it would not otherwise have reached. Accordingly, there was no error, much less plain error. See R. 2:10-2.

VII.
Defendant's final argument concerns the sentence the judge imposed and whether the judge erred in his application of aggravating and mitigating factors. Our review of the sentence is deferential. We will only disturb a sentence if a defendant demonstrates "such a clear error of judgment that it shocks the judicial conscience." State v. Roth, 95 N.J. 334, 364, 471 A.2d 370 (1984).
Defendant argues that his sentence must be vacated because the judge failed to articulate the reasons why he found the existence of aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9). Unquestionably, there is a need to deter not only this defendant, but others as well, from engaging in the type of brutal assault that defendant engaged in here. The record plainly supports the finding of aggravating factor nine.
The judge found the existence of mitigating factor eleven, undue hardship on defendant's dependents if he were to be incarcerated, N.J.S.A. 2C:44-1(b)(11). Defendant argues that additional factors were presented to the trial judge and the trial judge declined to find them. Defendant is incorrect. Defendant did not urge these additional mitigating factors until the March 17, 2006 motion for reconsideration of sentence, which occurred seven months after the sentence was imposed.[5]
Furthermore, the sentence that was imposed was only one year more than the midpoint of the sentencing range. In light of the vicious attack that has left Paul Smith blind and without a sense of smell or taste, unable to work, and unable to function without the assistance of a medical aide, the sentence imposed by the trial judge does not shock the judicial conscience. We also recognize that a conviction for attempted murder does not require as one of its elements that any injury be inflicted. Accordingly, the extent of injury inflicted, as the trial judge properly found, is a substantial aggravating factor. See State v. Mara, 253 N.J.Super. 204, 214, 601 A.2d 718 (App.Div.1992). Under all of the circumstances, the sentence imposed does not shock the judicial conscience.
Affirmed.
NOTES
[1] Defendant was also convicted of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), but that conviction was merged with the attempted murder conviction at sentencing.
[2] The Supreme Court reached a similar result in State v. Elkwisni, 190 N.J. 169, 181, 919 A.2d 122 (2007), when it held that the State is prohibited from using a defendant's delay in furnishing exculpatory information to suggest that he fabricated it. The Court held that such a suggestion impermissibly erodes a defendant's right to remain silent.
[3] We can understand why the trial judge may have been confused by the language in the model charge on Alibi. The charge might benefit from some revision. Specifically, the charge states in relevant part:

(CHARGE THE FOLLOWING PARAGRAPH ONLY WHERE APPROPRIATE:)
You have heard testimony about when (insert name of defendant or alibi witness) first came forward with (his/her) account of what happened. I instruct you that (insert name of defendant or alibi witness) had no obligation to provide an account at any time and there may be many reasons for (his/her) not doing so.
[CHARGE THE FOLLOWING SENTENCE IF APPLICABLE:]
You will recall that the witness testified that ___________________________.
You may consider the evidence concerning when (he/she) came forward, and why (he/ she) did so at that time, only for the limited purpose of deciding whether it affects the credibility of (his/her) account. You may not use the evidence to conclude that (insert name of defendant or alibi witness) violated some obligation to come forward, because (he/she) had no duty to speak on the subject with anyone.
Clearly, the first paragraph is intended to apply to testimony from a defendant or an alibi witness. In contrast, a portion of the second paragraph applies only to a witness and not to a defendant: "You may consider the evidence when (he/she) came forward, and why (he/she) did so at that time, only for the limited purpose of deciding whether it affects the credibility of (his/her) account." The sentence that follows applies to both a witness and a defendant.
The charge would benefit from an instruction to judges that the sentence we have quoted applies only to witnesses. Also, the words "(he/she)" should be changed to "(name of witness)" in order to avoid confusion to the jurors.
[4] Defendant's belated effort to raise that issue on motion for a new trial does not entitle him to avoid the plain error standard of review. An objection to a jury charge must be voiced when the charge is given. R. 1:7-2. See also State v. Savage, 172 N.J. 374, 387, 799 A.2d 477 (2002).
[5] Defendant's motion for reconsideration of sentence should not have been entertained. Rule 3:21-10(d) specifies that a sentence should not be reconsidered by a trial court during the pendency of an appeal unless notice has been provided to this court. No such notice was ever provided.