**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2654-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCO TULIO-ALVAREZ LOPEZ,

    Defendant-Appellant.

_____

Argued May 15, 2018 — Decided July 17, 2018

Before Judges Reisner, Hoffman, and Mayer.

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Indictment No.
15-05-1070.

Daniel S. Rockoff, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Daniel S. Rockoff, of counsel and on the
brief).

Roberta DiBiase, Supervising Assistant
Prosecutor, argued the cause for respondent
(Joseph D. Coronato, Ocean County Prosecutor,
attorney; Samuel Marzarella, Chief Appellate
Attorney, of counsel; Roberta DiBiase, on the
brief).

PER CURIAM

Defendant Marco Tulio-Alvarez Lopez appeals from his conviction for first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1), third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d), and fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d). He also appeals from the sentence of fifteen years in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirm.

I

Defendant was accused of stabbing his roommate (the victim), after the victim refused to lend defendant money. The victim suffered what the emergency room doctor described as a life-threatening stab wound to "the left side of his lower chest." The police found a bloody knife at the crime scene. The victim identified defendant as the man who stabbed him. According to the victim, after he refused to lend defendant fifty dollars, defendant exclaimed, "that's what you want," and stabbed the victim. Defendant then told a companion, "let's get out of here."

The landlord of the house, where defendant and the victim shared a rented room, told the police that, right after the incident, the victim stated that his roommate stabbed him. The landlord identified defendant as being the victim's roommate. The landlord also told the police that he saw defendant and another man running from the house, shortly after the stabbing. There was

2                                                    A-2654-15T3

no dispute that defendant was the victim's roommate, although the landlord knew him as "Juan" and the victim knew him as "Lucas."[1] The police found identification and correspondence with defendant's correct name on it, in a suitcase on one of the beds in the shared bedroom.

About two and a half hours after the stabbing, the police observed defendant walk from the back of the house and duck under the crime scene tape they had used to secure the scene. Defendant was shirtless and covered in fresh scratches, with a deep cut on one hand. From defendant's appearance, the police surmised that he had been in the heavy growth of woods and sticker bushes behind the house. The police arrested defendant and photographed him. From the photograph, both the landlord and the victim identified defendant as the victim's roommate.

In a statement to the police, given on the night of the incident, defendant denied stabbing the victim and gave several different explanations for his whereabouts that evening. First, he claimed that he slept through the entire incident. Then he

---

[1] Both the victim and the landlord testified that they were undocumented immigrants. According to the landlord, he rented rooms to people without checking their backgrounds or even asking for their last names. The victim testified that he first met defendant on the street a few months before the stabbing incident, and he let defendant room with him because defendant had no job, no food, and nowhere to live.

A-2654-15T3

stated that he was sitting in a closet thinking for a couple of hours, before coming outside to see what was happening. He later claimed that when the police first saw him, he was returning from urinating outside. Defendant denied running away from the house, and asserted that the scratches all over his torso were the result of his work as a roofer.

However, a police canine handler, called as a defense witness, testified that on the night of the stabbing, when the police were still searching for the suspect, she let a police bloodhound sniff a sock taken from defendant's suitcase in the bedroom. The dog then tracked the scent from the house to the parking lot of an apartment complex some distance away, before losing the scent. The parking lot was not far from the large tract of dense woods that extended past the back of the house.

## II

On this appeal, defendant raises the following points of argument:

> POINT I: THE COURT ERRED BY DENYING THE DEFENDANT'S PRE-TRIAL MOTION FOR A <u>WADE</u> HEARING TO TEST THE RELIABILITY OF THE IDENTIFICATION OF THE DEFENDANT AS THE PERPETRATOR.

> POINT II: THE COURT ERRED BY REFUSING TO LET THE JURY LEARN THAT THE ACCUSER HAD A BLOOD ALCOHOL CONTENT GREATER THAN .16 PERCENT, EVEN AFTER THE ACCUSER LIED AND TESTIFIED THAT HE HAD NOT BEEN INTOXICATED.

4

POINT III: THE COURT ERRED BY REFUSING THE DEFENDANT'S REQUEST TO INSTRUCT THE JURY ON ITS DUTY TO ASSESS THE SYSTEM VARIABLES.

POINT IV: THE COURT FAILED TO INSTRUCT THE JURY ON ITS DUTY TO ASSESS WHETHER THE DEFENDANT ACTUALLY MADE ALLEGED OUT-OF-COURT STATEMENTS CITED BY THE STATE TO PROVE THE IDENTIFICATION WAS RELIABLE. (Not Raised Below)

V. THE CUMULATIVE PREJUDICIAL EFFECT OF THESE ERRORS WAS THAT NO FACTFINDER EVER CRITICALLY EVALUATED THE SYSTEM OR ESTIMATOR VARIABLES ESSENTIAL TO THE MISIDENTIFICATION DEFENSE.

VI. THE SENTENCING COURT INAPPROPRIATELY CITED ELEMENTS OF THE CRIME AS A BASIS FOR FINDING AGGRAVATING FACTORS N.J.S.A. 2C:44-1A(1)-(2).

After reviewing the record, we find no basis to disturb the conviction or the sentence. Defendant's points IV and V are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We address defendant's remaining arguments below.

III

Defendant first argues that the trial court erred in denying his motion for a testimonial Wade[2] hearing to challenge the identifications made by the landlord and the victim. We affirm on this issue substantially for the reasons stated by the trial judge in her oral opinion on July 17, 2015. We add these comments.

---

[2] United States v. Wade, 388 U.S. 218 (1967).

The following information is derived from the record of the Wade motion.  During the investigation, the police learned that the victim claimed his roommate stabbed him, and the landlord saw the roommate running from the house shortly after the stabbing. In the landlord's statement to the police, it was clear that, immediately after the stabbing, the victim indicated his roommate stabbed him.  According to the landlord, the victim told him, "I'm going to die, he stabbed me bad . . . If I knew, I wouldn't bring him to live here."  There was some question as to whether the roommate might be using an alias.  The landlord told the police that he knew the roommate by the name "Juan Reyes."

The police showed defendant's photo to the landlord, for the purpose of determining whether the person depicted in the photo was the victim's roommate, regardless of the name by which the landlord knew him.  They also showed the photo to the victim, to determine if that was his roommate, the person whom the victim had already said was the assailant.  Both men confirmed that the man in the photo was the roommate.  Under those circumstances, and for that limited purpose, showing the witnesses only one photograph was not improperly suggestive.

"[T]o obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification."  State v. Henderson, 208 N.J. 208,

288 (2011) (emphasis added). That is not the case here. Showing the witnesses defendant's photo alone, instead of as part of a photo array, was not likely to lead to a mistaken identification. Further, the State established that the identifications were highly reliable. Id. at 289.

We agree with the trial judge that a testimonial Wade hearing was not required, but even if it was error not to hold a hearing, on this record the error was harmless. See R. 2:10-2. In the context of this case, the defense could not demonstrate "a very substantial likelihood of irreparable misidentification" so as to justify suppression of the identification evidence. Henderson, 208 N.J. at 289. In fact, there was no evidence of misidentification, i.e., no evidence that the person in the photograph was not the victim's roommate. Defendant's arguments on this point are without sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

IV

Next, defendant contends that the trial court erred in excluding from evidence a medical record purporting to show that the victim had a blood alcohol content (BAC) of about .16 when he was admitted to the hospital. Defendant contends that the blood test results would have contradicted the victim's testimony that he had not been drinking on the night he was stabbed and would

have cast doubt on his ability to perceive the events of that evening.

The issue arose in this context. The State called Dr. Knight as a fact and expert witness, to testify about the treatment he provided after the victim was brought to the emergency room. Dr. Knight's direct testimony was limited to describing the victim's stab wound, the danger it presented to his life if not treated, and the surgery Dr. Knight performed. According to Dr. Knight, as soon as he saw that the victim had a deep stab wound right under the rib cage, with body fat hanging out of it, he ordered the victim into surgery. He began operating about half an hour after the victim arrived at the ER.

On cross-examination, defense counsel asked Dr. Knight if it was important to know what substances a patient had in his system when brought to the emergency room. Dr. Knight responded that it was not a factor if there was a need for emergency surgery. In response to defense counsel's question, he confirmed that a blood test was done the night the victim was admitted to the hospital. However, in response to counsel's question about the victim's BAC, Dr. Knight stated that he had no recollection what the victim's BAC was. At that point, the prosecutor objected to further questioning about the blood test, absent a proper foundation.

A-2654-15T3

The judge permitted defense counsel to ask additional foundational questions. However, she ultimately declined to admit the blood test in evidence. The judge reasoned that the document had not been properly authenticated as a business record, there was no testimony from the person who took the blood sample, and Dr. Knight did not consider or use the document as part of his treatment or diagnosis of the patient. The judge reasoned that "it wasn't part of his diagnosis, it wasn't part of the treatment. [The test results] didn't even matter to him." In a later supplemental ruling, the judge also concluded that there was an insufficient foundation from which she could conclude that the substantive content of the document was trustworthy.

We review the judge's evidentiary ruling for abuse of discretion. State v. Kuropchak, 221 N.J. 368, 385 (2015). We find no abuse of discretion in the judge's decision that the document was not properly authenticated and was otherwise inadmissible without a further foundation. We agree with the judge's thorough statement of reasons placed on the record in denying the defense motion for a new trial on this issue.[3]

_____

[3] The State accurately notes that the blood test report in defendant's appendix actually lists the names of two different patients on the same pages — the victim and a person named "Quigley." In fact, Quigley's name, age and date of birth appear on the first page under "Physician Documentation." This raises a

A-2654-15T3

Defendant now argues that he should have been allowed to "refresh" Dr. Knight's recollection by showing him the blood test report.  See N.J.R.E. 612.  However, N.J.R.E. 612 is not a vehicle for placing before the jury information that would otherwise be inadmissible.  See State v. Caraballo, 330 N.J. Super. 545, 557 (App. Div. 2000).  Dr. Knight did not authenticate the blood test as a business record.  He did not know whether the blood was drawn in the ambulance or at the hospital.  He testified that he did not rely on the blood test result and it was irrelevant to his treatment or diagnosis of the victim.  Under those circumstances, an attempt to have the witness read from the report, in order to get the information before the jury for its truth, was improper.

Finally, even if the court erred in excluding the document, the error was harmless, if the report was offered to show that the victim was not truthful when he stated he had not been drinking.  By itself, that would not have changed the outcome of the trial and thus its exclusion had no clear capacity to produce an unjust result.  See R. 2:10-2.  As the trial judge noted, if the true purpose of placing the record before the jury was to create an inference that the victim was too intoxicated to identify an

_____

significant issue as to the authenticity, accuracy, and reliability of the document as a purported report of the victim's blood test.

assailant, the defense would have needed an expert to testify about the medical significance of a .16 BAC. Otherwise, the jury would be left to speculate about its significance.

V

Defendant next argues that the trial court erred in failing to give certain portions of the model charge concerning identification. Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. June 4, 2007). The judge read the jury ten pages of instructions about identification, and the pertinent factors to be considered. We conclude that the instructions she provided were sufficient in the context of this case. We agree with the judge that it was not necessary to instruct the jury about system variables, including the absence of a photo array and the normally-required procedural safeguards attendant on the identification process.

Nonetheless, even if it was error to omit the additional instructions defendant claims the court should have given, the error was harmless beyond a reasonable doubt. The police asked the witnesses whether the person in the photo was the victim's roommate, a person with whom the witnesses were familiar but whose true name they might not know. The likelihood that the witnesses would mis-identify the person in the photo as being the roommate, when he was not, was minimal.

11

More importantly, this case was not about observational mis-identification. There was never an issue about whether the victim could have been mistaken about whether his roommate stabbed him, or whether someone other than his roommate stabbed him. The stabbing took place in a lighted room, and was committed by a person who was standing right in front of the victim and was speaking to him. Moreover, the roommate was someone the victim had known for months and with whom he had shared a bedroom for months.

The defense theory was that, for some unexplained reason, the victim intentionally accused the wrong person, or the landlord misunderstood the victim's initial statement about who stabbed him and the police then focused on the wrong suspect. At no time did the defense argue that the victim mistakenly perceived or mistakenly remembered that defendant stabbed him when in fact someone else was the assailant. And the record would not support such an inference.

## VI

Finally, we address defendant's sentencing arguments. After determining and weighing the mitigating and aggravating factors, the trial court sentenced defendant to fifteen years in prison, subject to NERA, for first-degree attempted murder, and merged the other two offenses into the attempted murder conviction. We owe

12

deference to the trial court's sentencing decision, and we will not substitute our judgment for that of the sentencing court. State v. Lawless, 214 N.J. 594, 606 (2013).

Defendant argues that in finding aggravating factors one and two, the trial court double counted elements of the attempted murder offense. See State v. Fuentes, 217 N.J. 57, 74-75 (2014) (facts establishing elements of a crime should not also be considered as aggravating factors in sentencing).

Factor one directs the court to consider the nature and circumstances of the offense and whether it was committed in an especially heinous, cruel or depraved manner. N.J.S.A. 2C:44-1(a)(1). The judge considered that the victim had taken defendant in and given him food and shelter when he was destitute, and in return, defendant stabbed the victim when he would not give defendant money. The judge also found that the crime was committed in a depraved manner because it demonstrated an intent to inflict pain and suffering in addition to death. The judge also found that defendant stabbed the victim in the abdomen and "left him to die" and the victim "would have died" but for emergency surgery.

Defendant argues that the judge double counted the element of attempted murder, that defendant "does or omits to do anything with the purpose of" causing the victim's death. See N.J.S.A. 2C:5-1(a)(2). We disagree. Viewed in context, we do not find

that the judge's comments about leaving the victim to die constitute double counting of an element of attempted murder. It was part of the judge's overall description of defendant's particularly heinous and cruel course of conduct in inflicting maximum pain and suffering on the victim, and his cold-hearted treatment of a victim who had tried to help him. See Fuentes, 217 N.J. at 75; State v. Soto, 340 N.J. Super. 47, 54-55 (App. Div. 2001).

Factor two includes the gravity and seriousness of the harm inflicted on the victim. N.J.S.A. 2C:44-1(a)(2). In finding that factor, the trial court considered the nature of the victim's injuries "that required emergency lifesaving efforts and surgery." The judge considered that the victim was "stabbed in the abdomen" and the wound affected a number of "major organs." Those findings were consistent with Dr. Knight's testimony about the way the victim was stabbed, below the rib cage with an upward trajectory that affected the diaphragm, stomach, and lungs. Defendant argues that these findings constituted double counting of the element of acting with the purpose to cause the victim's death, and doing or omitting to do anything to cause the death. Again, we disagree.

Aggravating factor two "compels 'a pragmatic assessment of the totality of harm inflicted by the offender on the victim.'" Lawless, 214 N.J. at 611 (quoting State v. Kromphold, 162 N.J.

14                    A-2654-15T3

345, 358 (2000)). Under this rationale, "defendants who purposely or recklessly inflict substantial harm receive more severe sentences than other defendants." Kromphold, 162 N.J. at 358.

We have recognized that "[t]he extent of the injuries, which exceed the statutory minimum for the offense, may be considered as aggravating" for purposes of sentencing. State v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992). Moreover, "a conviction for attempted murder does not require as one of its elements that any injury be inflicted." See State v. Noble, 398 N.J. Super. 574, 599 (App. Div. 2008). Thus, a defendant who succeeds in almost killing a victim, by inflicting extensive injury, may be punished more harshly than a defendant who attempts to kill the victim but does not succeed in inflicting a serious wound. On this record, the trial court did not double count in finding aggravating factor two.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION