278 N.J. Super. 182 (1994)
650 A.2d 835
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS GREGG, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 1994.
Decided December 21, 1994.
*184 Before Judges PRESSLER, CONLEY and NEWMAN.
Judith L. Restagno argued the cause for appellant (Avena & Friedman, attorneys; Ms. Restagno, on the brief).
Marcy H. Geraci, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Geraci, of counsel and on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Defendant Thomas Gregg, driving while intoxicated, collided with a vehicle driven by Risa Wexler in which her grandfather Herb Falk was the front-seat passenger and her step-sister Elana Falk was the rear-seat passenger. Herb Falk died as a result of the injuries he sustained in the accident and the two women sustained injuries.
The ensuing indictment returned against Gregg charged him with aggravated manslaughter and a variety of assault and aggravated *185 assault charges. Following a two-week trial by jury, Gregg was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4a; aggravated assault of which Ms. Wexler was the victim, N.J.S.A. 2C:12-1b(1); the disorderly person's offense of simple assault of which Ms. Falk was the victim, N.J.S.A. 2C:12-1a(1); fourth-degree assault by auto causing serious bodily injury of Ms. Wexler, N.J.S.A. 2C:12-1c; and the disorderly person's offense of assault by auto causing bodily injury to Ms. Falk, N.J.S.A. 2C:12-1c. He was sentenced to a thirty-year term with a twelve-year period of parole ineligibility on the aggravated manslaughter conviction and a concurrent seven-year term on the aggravated assault conviction. No custodial term was imposed on the simple assault conviction and the assault by auto convictions were merged into the assault conviction.
In appealing from the judgment of conviction, defendant raises the following issues:
I. DEFENDANT'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY PROSECUTORIAL MISCONDUCT.
A. DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND SIXTH AMENDMENT RIGHTS TO A FAIR TRIAL WERE SERIOUSLY COMPROMISED WHEN THE COURT ALLOWED THE PROSECUTOR TO REPEATEDLY ELICIT TESTIMONY FROM WITNESSES ABOUT THE DEFENDANT'S CONDUCT AFTER THE ACCIDENT WITHOUT A LIMITING INSTRUCTION BY THE COURT TO THE JURY THAT THIS EVIDENCE COULD ONLY BE USED TO SHOW THE DEFENDANT'S ALCOHOLIC STATE; UNDER N.J.R.E. 402, OR, ALTERNATIVELY N.J.R.E. 403, THIS EVIDENCE SHOULD HAVE BEEN EXCLUDED.
B. DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND SIXTH AMENDMENT FAIR TRIAL RIGHTS WERE FURTHER COMPROMISED WHEN THE COURT ALLOWED THE PROSECUTOR TO REPEATEDLY REFER TO THE DEFENDANT'S ALCOHOLIC STATE BY PREJUDICIAL NAMES AND PHRASES.
C. DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS AND SIXTH AMENDMENT FAIR TRIAL RIGHTS WERE FURTHER COMPROMISED WHEN THE COURT ALLOWED THE PROSECUTOR TO REFER TO THE SUFFERING OF THE VICTIM IN HIS SUMMATION.
D. PROSECUTORIAL OVERZEALOUSNESS WAS ALSO APPARENT IN THE PROSECUTOR'S HAVING EACH EYEWITNESS TESTIFY THREE TIMES: BY RELATING THEIR OBSERVATIONS, BY TESTIFYING WITH A DIAGRAM AND BY TESTIFYING WITH AN AERIAL PHOTOGRAPH.

*186 E. THE PROSECUTOR MADE IMPROPER COMMENTS AS TO THE JURY'S DUTY WHICH CONSTITUTED PREJUDICIAL ERROR TO THE DEFENDANT AND CONTRIBUTED TO THE CUMULATIVE ERRORS AT DEFENDANT'S TRIAL.
II. THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS FURTHER PREJUDICED BY TRIAL COURT ERRORS WHICH WERE AN ABUSE OF THE JUDGE'S DISCRETION.
A. THE TRIAL COURT ERRED IN DENYING DR. RICCIOLI'S TESTIMONY OF THE DEFENDANT'S PATHOLOGICAL INTOXICATION DEFENSE.
B. THE TRIAL COURT ERRED IN ALLOWING RISA WEXLER TO TESTIFY ABOUT A FRACTURED KNEECAP SHE SUSTAINED IN THE MAY 27, 1991 AUTOMOBILE ACCIDENT IN LIGHT OF THE FACT THAT THE DEFENSE WAS FIRST PROVIDED WITH THIS INFORMATION BY THE PROSECUTOR AT THE TIME OF TRIAL.
C. THE TRIAL COURT ERRED IN ALLOWING DR. CHARLES TINDALL TO TESTIFY AS AN EXPERT WITNESS IN LIGHT OF THE FACT THAT THE DEFENDANT WAS FIRST GIVEN HIS NAME AS A WITNESS AND PROVIDED WITH A SYNOPSIS OF HIS PURPORTED TESTIMONY BY THE PROSECUTOR LESS THAN THREE WEEKS PRIOR TO THE COMMENCEMENT OF TRIAL.
D. THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY THAT A PROSECUTION WITNESS, ALAN ROSENBAUM, COMMITTED POSSIBLE PERJURY AT A N.J.R.E. 104 HEARING INVOLVING THE ISSUE OF HIS PRIOR ARRESTS AND CONVICTIONS.
III. THE EXCESSES OF THE PROSECUTOR COUPLED WITH THE ADMISSION OF EVIDENCE OF DEFENDANT'S CONDUCT AFTER THE COLLISION, WHICH WAS IMPROPERLY ADMITTED WITHOUT ANY LIMITING INSTRUCTION AND THE OTHER ERRORS BY THE TRIAL COURT CONSTITUTED AN AGGREGATE OF ERRORS WHICH CLEARLY WARRANT REVERSAL OF DEFENDANT'S CONVICTIONS UNDER THE PRINCIPLE OF CUMULATIVE ERROR.
IV. THE TRIAL COURT ERRED BY IMPOSING AN EXCESSIVE SENTENCE IN CONTRAVENTION OF N.J.S.A. 2C:43 ET SEQ. AND N.J.S.A. 2C:44 ET SEQ.
A. THE TRIAL COURT IMPROPERLY "DOUBLE COUNTED" RECKLESS CONDUCT BY THE DEFENDANT AS AN AGGRAVATING FACTOR PURSUANT TO N.J.S.A. 2C:44-1.
B. THE TRIAL COURT IMPROPERLY GAVE WEIGHT TO OTHER AGGRAVATING FACTORS, SUCH WEIGHT BEING AGAINST A PREPONDERANCE OF THE EVIDENCE.
C. THE TRIAL COURT IMPROPERLY DISREGARDED MITIGATING FACTORS WHICH WERE EVIDENT BY A PREPONDERANCE OF THE EVIDENCE.

*187 D. THE TRIAL COURT FAILED TO STATE SEPARATELY ITS WEIGHING OF FACTORS FOR PAROLE INELIGIBILITY PURSUANT TO N.J.S.A. 2C:43-6(B).
E. THE TRIAL COURT IMPROPERLY IMPOSED THE S.N.S.F. PENALTY AND THE INCORRECT V.C.C.B. ASSESSMENT.
We reverse the conviction and remand for a new trial because we are persuaded that the fundamental fairness required of the criminal trial process was irretrievably compromised by the prosecutorial excesses in the State's summation coupled with the admission of prejudicially repetitious testimony and testimony admitted contrary to discovery theretofore provided to defendant.
Defendant, forty-two years old at the time of this event, married, the father of four children, and a resident of Bergen County, is a serious alcoholic of long standing. At the time of this accident, he had already had "many charges" of driving while intoxicated, had obtained driving licenses in other states, suffered from alcoholic black-outs, and lost time from work. Although he had entered an in-patient detoxification program several years before, he had left it after only ten days. It further appears that Gregg was what is known as a binge drinker, alternating considerable periods of abstinence with periods of heavy drinking.
The binge which ended so tragically in Mr. Falk's death began on the evening of May 26, 1991, the day before Memorial Day, when Gregg consumed a six-pack of beer, breaking a several-month abstinence. On the morning of Memorial Day, he found the family dog dead and blamed himself for the mishap. He arranged to have the dog buried at a pet cemetery, returning home from that task in the early afternoon. He had by that time been drinking beer fairly steadily. In mid-afternoon, he decided to leave the depressed environment of his home and drive his pick-up truck to Cherry Hill to visit friends. It was that odyssey of driving southward on the major highways of the state punctuated by stops at bars to drink beer which finally brought him, at about 8 p.m., to Matawan Road in Old Bridge. He had been observed shortly before by several witnesses driving dangerously and erratically. The odyssey ended when he collided head-on into the *188 Wexler vehicle which was stopped at the intersection of Matawan Road and Cliffwood Avenue waiting to make a left turn. Defendant was then speeding, was in the wrong lane of travel, had never applied his brakes and had not taken any other evasive action. He too was injured in the collision and taken to a nearby hospital where, two hours after the accident, blood tests showed his blood alcohol level to be .298 percent. It was extrapolated as over .3 when the collision occurred. There were also traces of Valium suggesting ingestion within the prior twenty-four hour period. There was considerable testimony respecting his verbal and physical abusiveness to those around him after the crash.
The facts adduced by the State, including the events that took place up to the time of the crash, were undoubtedly more than sufficient to sustain, beyond a reasonable doubt, a verdict of aggravated manslaughter under N.J.S.A. 2C:11-4a, namely, a criminal homicide where "the actor recklessly causes death under circumstances manifesting extreme indifference to human life." Our problem with the verdict is that the prosecutor was not content to present and argue the relevant facts that proved his case. He was, rather, intent upon portraying defendant as an utterly and thoroughly worthless and depraved human being.
We address first the evidence respecting defendant's post-crash behavior. The prosecutor called a parade of witnesses to testify as to defendant's conduct following the crash and at a time when he was himself injured, in shock, and very, very drunk, and, of course, at a time after the conduct that was the gravamen of the charge had already taken place. In view of defendant's inordinately high blood alcohol level, the degree of his intoxication at the time of the crash was evident. Hence the only relevance of defendant's post-crash conduct was to corroborate what had already been proved in that regard. That conduct, however, became the centerpiece of the trial. The repetition of that evidence by multiple witnesses obviously reinforced the impression the prosecutor was intending to convey to the jury of defendant's fundamentally bad character. It also served as the foundation for *189 the prosecutor's address of the jury in his opening and closing statements. Thus, in summation, he characterized defendant's post-crash conduct as that of a person who is "wasted, trashed, rip-roaring drunk, grossly, outrageously intoxicated, ossified, dead drunk, falling down until violently drunk." These pejoratives were consistent with his description in his opening statement, in which, after employing a variety of personally demeaning and degrading epithets, he summed up for the jury defendant's post-crash behavior as that of a "nasty, violent drunk, disgustingly drunk...." The "violent, nasty drunk" theme was returned to again and again. The culmination of the prosecutor's post-crash description of defendant was this invitation to the jury's collective imagination:
If you could just use a split screen for a second, there's one image, it's got to be indelibly printed in your head. You think in terms of a split screen where you see on television where they show one-half of a football game, another half of a football game. Picture here is Herb Falk fighting for his life, writhing in pain and agony, slowing [sic] dying from within, bleeding to death from within, and while Herb Falk is suffering in that agony at the same time here's the defendant spitting, cursing, fighting, threatening and behaving just in an absolutely disgusting manner. That image has to be imprinted in your mind. While this innocent man is dying this man was making a complete, complete fool of himself because of the alcohol that he consumed.
There was indeed very little of the summation that was not couched in terms of personal pejorative. At one point the prosecutor had this to say:
And if he wants to drink himself into oblivion or drink himself into a coma or drink and do whatever he wants, watch television, pick his nose, do whatever he wants to do, and not get behind the wheel of a car, that's his business, but the minute he had that much to drink, to the tune of a .298 blood alcohol level, and got behind the wheel of that truck and drove the way he drove and killed an innocent man it became my business and it became your business and it became your business to convict him of aggravated manslaughter.
The prosecutor repeatedly resorted to name-calling, referring to defendant as disgusting, a ninny, a buffoon, nasty, and violent, and using a whole slang dictionary's worth of demeaning colloquialisms for an intoxicated person. In short, while we have no doubt that the evidence respecting defendant's post-crash behavior was relevant, albeit to a limited degree and for a limited *190 purpose, it is regrettably clear that the prosecutor abused this evidence by using it for the primary purpose of portraying defendant as an utterly vile, contemptible and despicable person.
We do not intend in any way to minimize the tragedy suffered by the Falk family or to suggest anything but the most profound disapprobation of defendant's conduct. Our overriding concern, however, is with the integrity of the criminal justice system. We do not doubt the prosecutor's right  indeed, his obligation  to present the State's case forcefully and graphically, and we recognize that he is, therefore, accorded broad latitude in his summing up. See, e.g., State v. Purnell, 126 N.J. 518, 540, 601 A.2d 175 (1992); State v. Zola, 112 N.J. 384, 427-428, 548 A.2d 1022 (1988), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989); State v. Pratt, 226 N.J. Super. 307, 323, 544 A.2d 392 (App.Div.), certif. denied, 114 N.J. 314, 554 A.2d 864 (1988). Nevertheless, prosecutors also have the overriding obligation to see that justice is fairly done. Thus, as we said in State v. Marks, 201 N.J. Super. 514, 535, 493 A.2d 596 (App.Div. 1985), certif. denied, 102 N.J. 393, 508 A.2d 253 (1986), the prosecutor's "obligation to play fair is as compelling as his responsibility to protect the public." The prosecutor is not, therefore, at liberty to obtain a conviction by striking "a foul blow...." State v. Gookins, 135 N.J. 42, 49, 637 A.2d 1255 (1994) (reiterating the guiding principle that in reviewing criminal convictions, the court must assure continuing public confidence in the impartiality and fairness of the judicial process).
As the Supreme Court made clear in State v. Clausell, 121 N.J. 298, 341, 580 A.2d 221 (1990), the prosecutor is required to refrain from making derogatory statements about a criminal defendant. See also State v. Pennington, 119 N.J. 547, 576-577, 575 A.2d 816 (1990); State v. Williams, 113 N.J. 393, 455, 550 A.2d 1172 (1988); State v. Wilson, 57 N.J. 39, 50-51, 269 A.2d 153 (1970); State v. Stewart, 162 N.J. Super. 96, 102-103, 392 A.2d 234 (App.Div. 1978). The prosecutor here based his whole presentation to the jury on derogatory remarks whose effect on the jury *191 was obviously exacerbated, and intended to be exacerbated, by his excessive references to the victim impact of defendant's criminal conduct. See, e.g., State v. Harvey, 121 N.J. 407, 425, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991). In sum, the prosecutorial strategy here was plainly designed to impassion the jury. See State v. Hightower, 120 N.J. 378, 411, 577 A.2d 99 (1990). That strategy denied defendant a fair trial based on the admissible evidence to which he was constitutionally entitled. While we are mindful of the plain-error rule in the context of substantial admissible evidence of a defendant's guilt, we are also persuaded that when there has been a substantial subversion of the justice system, as here, the only proper remedy is a new trial.
Since defendant must be retried, we need not address at length the other issues he raises on this appeal. We do, however, note the following. We are satisfied, for the reasons stated by him, that the trial judge did not err in rejecting the proffered defense of pathological intoxication under N.J.S.A. 2C:2-8d. See State v. Sette, 259 N.J. Super. 156, 611 A.2d 1129 (App.Div. 1992), certif. denied, 130 N.J. 597, 617 A.2d 1219 (1992). We are also satisfied that the judge did not mistakenly exercise his discretion in permitting the State to offer Dr. Charles Tindall as a witness despite the late furnishing of his report to the defense. The import of Dr. Tindall's testimony was largely responsive to the pathological intoxication defense and consequently in the nature of rebuttal. Nor do we find error in the judge's refusal to charge the jury regarding the perjury of a State's witness who, at a Rule 104 hearing, did not disclose his disorderly person's convictions in response to a question respecting prior criminal convictions. The status of disorderly person's convictions in this context is at least equivocal, and a perjury charge would have been inappropriate. We are, however, satisfied that once the court made the entirely proper ruling of excluding medical evidence of Ms. Wexler's fractured patella because of the prosecutor's discovery failure, it was error to permit Ms. Wexler herself to testify respecting the *192 fracture. The fracture was a matter of substantial moment, representing the only basis on which her injuries could have been regarded as sufficiently serious to justify an aggravated assault, rather than a simple assault, conviction. Consequently, we conclude the defendant's conviction of that crime was reversible on that ground alone.
Nor need we address defendant's challenges to the sentence imposed upon him. We do note, however, the extent to which the judge's statement of reasons concentrated on defendant's post-crash conduct. We assume, however, that if defendant is again convicted following a trial at which that conduct will be properly focused, it will be properly taken into account, if at all, by the court.
The conviction appealed from is reversed, and we remand for a new trial.