# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5299-15T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUIS H. ELIAS-VELASCO,
a/k/a LUIS H. VELASCO,

     Defendant-Appellant.

_____

Submitted October 31, 2018 – Decided December 14, 2018

Before Judges Koblitz, Currier and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 14-12-1832.

Joseph E. Krakora, Public Defender, attorney for appellant (Gilbert G. Miller, Designated Counsel, on the brief).

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent (Jenny X. Zhang, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Luis H. Elias-Velasco appeals from a May 27, 2016 judgment of conviction for third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). Although indicted and tried on two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts one and two); one count of third-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count three); and one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count four), the jury convicted defendant only of count four as amended to a lesser-included third-degree charge. Defendant argues the State's presentation of an English transcript of his videotaped Spanish statement, absent testimony from the translator as to its accuracy, violated his Sixth Amendment rights, and the jury was improperly instructed with respect to the transcript. He also argues the prosecutor's comments in summation deprived him of a fair trial. After reviewing the record in light of the contentions advanced on appeal, we affirm.

Defendant was asked by a friend, D.G. (Danielle), to watch her two children, H.T. (Hannah) and K.T. (Kyle), for the night while she went to the hospital to give birth.[1] At the time, Hannah was eleven years old and Kyle was fourteen. Defendant and his wife, D.N. (Donna) had previously lived with

---

[1] We use initials and pseudonyms to protect the privacy interests of the parties. R. 1:38-3(c)(12).

Danielle and the children for approximately five years, beginning when Hannah and Kyle were toddlers. After moving into their own apartment, defendant and his wife maintained their friendship with Danielle and continued to periodically visit and babysit the children.

In early August 2012, Hannah and Kyle spent the night at defendant's home, a one-room apartment with a bed and a pull-out couch. Hannah and Kyle slept in the bed while defendant and his wife shared the couch. The next day, the children left to meet their mother at the hospital. Over the course of the next two years, Hannah reported to several people -- including her best friend, Sandy; her mother; a hospital employee; and a home therapist -- that defendant sexually abused her while she stayed at his apartment that night.

According to Hannah, before 8:00 a.m., as defendant was getting ready to go to work, he climbed onto the bed, pulled down Hannah's pajama pants and put his mouth and his hands on her vagina and backside, in non-penetrative skin-to-skin contact. Hannah testified Kyle was in the bed at the time and Donna was on the couch nearby, but both slept through the incident. According to Hannah, the assault lasted about ten minutes, after which defendant left for work.

Nearly two years later, Hannah told her therapist about the incident; the therapist reported the allegations to the Division of Child Protection and

Permanency, which referred the matter to the police. In August 2014, Hannah and her mother spoke to Cliffside Park police detective George Santiago about the incident. The police went to defendant's apartment and told his wife they wanted to speak with him. Shortly thereafter, defendant voluntarily went to the Cliffside Park police station.

Defendant, a native Spanish speaker, was read his Miranda[2] rights by Detective George Santiago, who is fluent in Spanish, and was provided a Spanish-language Miranda form. Defendant signed the form and agreed to speak with the police. The interview was videotaped and conducted entirely in Spanish. Defendant denied Hannah's allegations, but when asked by Santiago whether it was possible, if defendant was very drunk, that he may have done something and not remembered it, defendant stated, "is possible, . . . one sometimes a little drunk, I don't know, one doesn't remember." At the end of the interview, defendant was placed under arrest.

## I. The Statement

At the Miranda hearing, the State presented an English-language transcript of the interview prepared by a certified translator from the prosecutor's office. Defense counsel was provided a copy of the transcript the day before the

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

hearing. Defense counsel, who appeared to be fluent in Spanish, told the court she reviewed the transcript, and had "some proposed changes," which she provided to the assistant prosecutor.

The parties and the court followed along with the transcript while the video of the statement played. Defense counsel and the prosecutor went page by page, line by line, suggesting their respective edits of the transcript. Each party consented to the other's edits. With respect to proposed redactions, the prosecutor and defense counsel agreed to discuss redactions after the hearing and come to an agreement before trial. At the close of the hearing, the judge ruled the statement was admissible.

On another day, the judge heard argument regarding defendant's motion to redact certain portions of defendant's statement. In clarifying which portions defendant wanted to redact, defense counsel referred to page and line citations from the transcript. Defense counsel expressed her lack of concern about any other portion of the transcript. After hearing argument from both parties, the judge ruled the challenged portions of the statement admissible, but that a limiting instruction would be required to "instruct the jury that it is their function to determine if the statements were actually made by the defendant" and "if they

A-5299-15T3

are credible." The judge instructed counsel "to work together to come up with a limiting instruction for the [c]ourt."

## II. The Trial

The State presented five witnesses at trial: Hannah's mother, Danielle; Hannah; Kyle; Hannah's best friend, Sandy; and Detective Santiago. Defendant called Donna and two character witnesses. He elected not to testify.

Sandy testified that Hannah told her on the afternoon of August 3, 2012, that "something happened" and "somebody touched her" while she stayed at defendant's house the night before, but Hannah did not give specific information or identify defendant. Hannah's mother testified that Hannah told her on or around August 4, 2012, that "the man had touched her" in her "intimate part," while she stayed at defendant's home, but Danielle elected not to contact the police, and instead, told Hannah to stay away from defendant and his wife.

Donna testified that on the morning of the incident, she and defendant woke up together just before 7:00 a.m., and she helped him get ready for work as the children slept. Donna stated that the children slept through the night, and were asleep through the time defendant left for work. Donna also testified that, about two weeks before trial, the police brought her to the station and asked her six specific questions. On cross-examination, the prosecutor asked Donna

6

whether one of the questions was if she "[saw] or [heard] anything" on the night of the incident. Donna confirmed that was one of the questions. Donna confirmed that she did not tell the police about checking on the children in the middle of the night, or certain other details about helping defendant get ready in the morning, to which she had testified on direct.

The video of defendant's statement was played for the jury during Detective Santiago's testimony. The video was presented on a split-screen, with the transcript scrolling on one side of the screen as the video played; each juror was also provided a hard copy of the transcript to follow along as the video played. The translator who prepared the English transcript was not called to testify as to its accuracy.

Defendant argues on appeal:

> POINT I: THE JURY'S USE OF THE ENGLISH-LANGUAGE TRANSCRIBED TRANSLATION OF DEFENDANT'S VIDEOTAPED SPANISH-LANGUAGE STATEMENT TO POLICE, AS A DETECTIVE UNSCROLLED THE TRANSCRIPT ON HALF OF A SPLIT SCREEN AT A PACE PURPORTEDLY SYNCHRONIZED WITH THE UNFOLDING DIALOGUE OF THE VIDEOTAPED STATEMENT PLAYING ON THE OTHER HALF OF THE SCREEN, WITHOUT THE TRANSLATOR APPEARING TO TESTIFY THAT THE TRANSLATION ON THE TRANSCRIPT WAS AUTHENTIC AND ACCURATE, VIOLATED THE SIXTH AMENDMENT'S PROHIBITION AGAINST

TESTIMONIAL HEARSAY AND THE HEARSAY PROSCRIPTION OF THE NEW JERSEY RULES OF EVIDENCE. (Not raised below)

POINT II: THE COURT'S INSTRUCTIONS REGARDING THE JURY'S EVALUATION OF [DEFENDANT'S] VIDEOTAPED STATEMENT WERE PLAINLY ERRONEOUS, AS THEY DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY AND A FAIR TRIAL. (Not raised below)

POINT III: THE PROSECUTOR ENGAGED IN MULTIPLE INSTANCES OF MISCONDUCT ON SUMMATION WHICH INDIVIDUALLY AND CUMULATIVELY DEPRIVED DEFENDANT OF A FAIR TRIAL.

III. English Transcript of Defendant's Statement

Defense Points I and II were not raised in the trial court and are therefore reviewed for plain error. R. 2:10-2. Plain error is one that is "clearly capable of producing an unjust result." R. 2:10-2. Such an error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Chavies, 345 N.J. Super. 254, 265 (App. Div. 2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Before the video was played, the judge explained to the jurors the process by which the transcript would be displayed along with the video, and told the jury they had "the option of reading and watching on the screen or reading the

transcript . . . ." Defense counsel did not object. The judge offered no other instruction to the jurors at that time.

At one point, a juror asked what "IA" meant, as it appeared on the transcript. The question was then posed to Detective Santiago, who testified: "Inaudible, occasionally the acoustics in the room don't always allow for clear sound to be picked up. So if the transcriber can't figure out what it is, they don't guess they just put down inaudible."

The transcript was marked for identification, but was not admitted into evidence because the State objected. Defendant argues the use of the transcript at trial, absent any testimony from the transcriber as to its accuracy, violated the Sixth Amendment's prohibition on testimonial hearsay, and the New Jersey evidence rules. Defendant further asserts the court improperly instructed the jury with respect to his statement. Neither argument was raised in the trial court.

According to defendant, the transcript was prepared in anticipation of, and for the purpose of, litigation, and therefore does not fall under any business record exception to the hearsay rule. Defendant contends the fact that the transcript was never formally submitted into evidence is irrelevant; the jurors were provided no other means of translating defendant's videotaped statement,

therefore, the translation constituted substantive evidence, not simply a visual aid.

"Mistakes at trial are subject to the invited-error doctrine." State v. A.R., 213 N.J. 542, 561 (2013). "Under that settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . .'" Ibid. (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

Appellate courts may consider an induced or invited error on appeal if that error "cut mortally into the substantive rights of the defendant." State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974). In such cases, the court may decline to apply the invited error doctrine when doing so would "cause a fundamental miscarriage of justice." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 508 (1996)).

Here, defense counsel actively participated in the creation of the transcript, referred to the transcript in her motions and her closing argument, and insisted the jury not watch portions of the videotaped statement without the accompanying transcript. Indeed, defense counsel told the jury during summation to "focus . . . on that statement because you'll have it. And, you can

read parts of it or all of it." When the jury requested to view certain video clips of the statement during deliberations, defense counsel insisted, "you can't just play the clips without the transcript."

Given defendant's participation in perfecting the English transcript and active involvement in urging the jury have access to the transcript, we find no error in its use.

## IV. Jury Charge

Defendant also claims the court had an obligation to instruct the jury "as to how the jury should deal with the interrelation between the English language on the transcript and Spanish language of the videotaped statement which was actually in evidence." Defendant further asserts the court should have instructed jurors "not to use any [personal] knowledge of Spanish which they might have to interpret the Spanish on the videotape," as such knowledge constitutes an improper outside influence on the jury.

The judge asked defense counsel for input regarding "the instruction on defendant's statement." Defense counsel stated, "I took a stab . . . at drafting something that I thought somewhat applies but I didn't find in the model [jury] charges . . . if I could just make some copies and just give these to the State." Defense counsel then provided the prosecutor and the court with a copy of her

11

proposed jury instructions. Defense counsel explained where to place her recommended wording within the overall charge. The prosecutor responded, "I have no objection to the language." Defense counsel and the prosecutor then conferred about the final charge with respect to the statement, with defense counsel stating "[t]hat's fine" to the final proposed charge.

After closing arguments, the trial judge provided the following instructions with respect to defendant's statement:

> Now, I want to address with you the statement by the defendant.
>
> There is for your consideration in this case, a recorded statement made by the defendant. In considering how much weight, if any, you should place on this statement or portions thereof, you should take into consideration all of the facts and circumstances regarding both the taking of the statement and the answers that were given to the questions that were asked as well as the other evidence relating to this case.
>
> If after consideration of all of these factors, you determine that the statement is not credible, then you must completely disregard that statement. If you find that part or all of the statement is credible, then you may give whatever weight that you think is appropriate to that portion or portions of the statement that you find truthful an[d] credible.
>
> As I mentioned, there is, for your consideration in this case, a recorded statement made by the defendant. It is marked S-15 in evidence and you will have a copy of it when you are in the jury room. I instruct you in that

12

case that there are also, and I've already told you this once before, there are certain portions of the recorded statement that are redacted -- they've not been provided to you.

You may only consider those portions of the statement which have been admitted into evidence and must not speculate as to the contents of the omission or the reason or reasons for the omissions.

After the judge finished giving the jury these instructions, the prosecutor reminded the judge that the jury would not have a copy of defendant's statement with them in the jury room. The judge then gave the following instruction:

All right, ladies and gentlemen of the jury, there's just one modification to my instruction. When I -- when I referred to [defendant's] statement, I indicated that you would have that in the jury room.

That is the one thing you will not have in the jury room. If you wish to view that statement, you will come back out into the courtroom -- that's only if you wish to, obviously. And, you will consider all of the evidence collectively.

But, if you do wish to view the statement, you'll have to come back out to court and then obviously a transcript can be provided to you if -- if that's how you wish to view it. Or, you can just view as Counsel has been doing where it's a half screen -- the interview and then the translation.

Before deliberations began, the trial judge asked the parties "to view all the evidence to make sure that the evidence and the verdict sheet [were] in

13

order," and asked both counsel, "[c]an you state for the record . . . whether the evidence and verdict sheet are in order?" Defense counsel stated, "Yes, Judge. I did review the evidence. It is in order. I did, also, review the verdict sheet and some of the jury instructions." Defense counsel offered no objections or suggested changes or additions to the jury instructions.

During deliberations, the jury requested to view the videotape of defendant's statement again with the transcript. Defense counsel offered no objection. The jurors were shown the video and provided copies of the transcript to follow along. Afterwards, one of the jurors appears to have asked whether the jury could take the transcript into the jury room, to which the judge responded, "[y]ou cannot." The judge gave the following instruction:

> Ladies and gentlemen of the jury, you requested a playback of the audio statement of the defendant. And that recorded testimony has been played for you. In your deliberations you are instructed to consider all of the evidence and not give undue weight to the testimony you've heard being played back. You are to consider all of the evidence.

After deliberating for a few hours, the jury again requested to re-watch the portions of defendant's statement the prosecutor had played during her summation. Defense counsel proposed showing the jury a segment of the video containing all four "clips" used by the prosecutor, rather than playing the clips

14

alone without the intervening content. Defense counsel argued it "make[s] more sense to play them continuously because you can't just play the clips without the transcript . . . ."

The jurors were then played the entire segment of defendant's statement containing the four clips, and were again provided the transcript to follow along. Afterwards, the judge instructed the jury again that they "must consider all of the testimony collectively."

The jury did not reach a verdict on the first day, so deliberations continued the following day, when another judge stood in for the trial judge, who was unavailable. The jury requested "to see the transcript of [defendant]'s testimony, video, again for clarification to help us decide?" Defense counsel informed the new judge that the reason the transcript was not in evidence was because the State would not stipulate to its accuracy.

The jury was played the portion of defendant's statement corresponding to pages eighteen through twenty-seven of the transcript. After the video was played, the judge reminded the jury "to consider all the evidence presented, and don't give undue weight to any specific testimony that you've heard. Consider everything in the context."

15

When a defendant does not object to a jury charge at trial, the charge is reviewed under the plain error doctrine. State v. Noble, 398 N.J. Super. 574, 593 (App. Div. 2008); see also R. 1:7-2; R. 2:10-2. In the context of a jury charge, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Noble, 398 N.J. Super. at 593 (alteration in original) (quoting State v. Brown, 190 N.J. 144, 160 (2007)).

"[E]rroneous [jury] instructions are almost invariably regarded as prejudicial. Such errors are 'poor candidates for rehabilitation under the harmless error philosophy.'" State v. Vick, 117 N.J. 288, 289 (1989) (quoting State v. Crisantos (Arriagas), 102 N.J. 265, 273 (1986)). In reviewing a challenged jury instruction, the appellate court "must read the charge 'as a whole [to determine] whether there was' plain error." Noble, 398 N.J. Super. at 594 (quoting State v. Torres, 183 N.J. 554, 564 (2005)).

Defense counsel actively participated in the drafting of the jury charge regarding defendant's statement. She was instructed by the court to submit a proposed instruction and she did so. Defense counsel's active participation in crafting the transcript and the jury instructions precludes reversal, based on the

16

invited error doctrine.  As we stated in <u>A.R.</u>, "[t]his case is not one . . . in which defense counsel merely failed to object to the course selected by the trial judge." <u>A.R.</u>, 213 N.J. at 561 (applying invited error doctrine); <u>cf.</u> <u>State v. Bailey</u>, 231 N.J. 474, 490 (2018) (declining to apply invited error for jury charge where defendant failed to object to use of the model jury instruction).

Application of the invited error doctrine in this context would not cause a fundamental injustice.  Defendant does not argue the transcript was inaccurate. The jury was instructed to consider the full context of defendant's statement and was repeatedly instructed not to give the statement undue weight in relation to other evidence.

## V.  Prosecutorial Misconduct

"Prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." <u>State v. Timmendequas</u>, 161 N.J. 515, 587 (1999). In reviewing the challenged portion(s) of a prosecutor's closing argument, appellate courts must "consider the 'fair import' of the State's summation in its entirety." <u>State v. Jackson</u>, 211 N.J. 394, 409 (2012) (quoting <u>State v. Wakefield</u>, 190 N.J. 397, 457 (2007)).  "A finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair

trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

> Three factors guide the [reviewing] [c]ourt's assessment of the impact of improper prosecutorial remarks: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them."
>
> [Jackson, 211 N.J. at 409 (quoting Smith, 167 N.J. at 182).]

In summation, the prosecutor began by addressing the undisputed facts – that Hannah and Kyle spent the night at defendant's apartment in early August 2012; that defendant and his wife were good family friends of Danielle and the children prior to the incident; and that defendant and his wife had both stated that they loved the children as their own. When addressing the testimony of the witnesses, the prosecutor made several comments with which defendant takes issue, most of which defendant objected to at the time. In discussing Donna's testimony, the prosecutor told the jury:

> What I find unacceptable -- what I find insulting, is that she will come here and testify that she remembers waking up and checking the children, that she remembers what time it was, getting the clothes for him -- all this stuff, but two weeks ago, that she never told the police that at all.

. . . She went to the police department. She answered the questions. She was told that she didn't have to and she did.

And, in those questions about what happened on August 2nd, 2012, never mentioned it at all. So, how do two weeks later, you come here and come up with a story -- literally invented from thin air, that we are supposed to rely on.

Defense counsel objected, and the court overruled the objection.

The prosecutor continued, opining that Donna's failure to report certain details to the police did not merely constitute inconsistency in her testimony, but rather, was indicative of "deceit. Deceit is someone who comes and lies to you. That's the lie that is unacceptable."

Moving on, the prosecutor addressed Donna's trial testimony that Danielle would occasionally leave the children with defendant and Donna from Friday through Sunday, despite initially stating she would pick them up on Saturday. The prosecutor made the following comments, over defendant's objections:

[PROSECUTOR]: And, the third thing that I wanted to point out that I recall from [Donna]'s testimony -- and what I found, I don't know maybe just personally offensive, was that --

[DEFENSE COUNSEL]: Objection, Judge.

THE COURT: Counsel -- personally offensive, please rephrase.

[PROSECUTOR]: Okay. What I submit that I would think is offensive is that she comes and talks so poorly about [Danielle]. [Danielle], who is the child's mother, who is not a witness to anything, who has never said a bad word about her at all, who has never called the police on her husband, who has -- who she has known intimately, by her own words, who she has lived with, and who she has known, who she knew when she lived with the children's father, who she knew how this father left them to go to another country, that she knew that she worked cleaning on her hands -- on her hands and knees cleaning toilets and all you can think of --

[DEFENSE COUNSEL]: Objection, Judge. There's no testimony to that effect.

[PROSECUTOR]: That was in the witness' testimony.

THE COURT: The testimony is that [Danielle] cleaned homes -- cleaned houses. Please proceed.

[PROSECUTOR]: That was the testimony by [Donna] -- that she knew that to be true. And, if that's what she knows to be true, that the only thing that she can come here to tell -- to add on is that, oh, to try to disparage [Danielle] as a mother somehow. Because, somehow that would help. I didn't understand. But, it is offensive that you can go that far. Because there is no evidence at all that these children were not taken care of or not provided for.

The prosecutor then addressed Danielle's actions in failing to call the police when Hannah purportedly disclosed the abuse in 2012. Defense counsel had argued that Danielle's failure to report the incident to police was evidence

that in fact, Hannah never made the disclosure to her in 2012. Countering that claim, the prosecutor argued, again over defendant's objections:

> [PROSECUTOR]: I don't know how you feel about that. But, I -- I can't help it -- you know, it's like, how do you not call the police. Your daughter tells you this -- a man touched her. She tells you it's definitely in her private parts. And, you sit there and you cry and you let your daughter cry and you tell her to stay away. And, you just -- you feel that that's protecting her.
>
> I don't know how you feel about it, but I feel like I could never do that.
>
> [DEFENSE COUNSEL]: Objection, Judge. How [c]ounsel would feel --
>
> [THE COURT]: Counsel, I'm going to ask that we allow [c]ounsel to complete her closing statement.
>
> [DEFENSE COUNSEL]: Yes, Your Honor. But, it's inappropriate for [c]ounsel to say what she would feel -- what she would do.
>
> THE COURT: Counsel, continue. Overruled.
>
> [PROSECUTOR]: But, I have a law degree. I have a job. I have extended friends and family. I have a loud voice. I have the ability to do more I would hope. But, if I was in [Danielle]'s position, could I do any better? I don't know.

Finally, the prosecutor argued against the defense counsel's use of the term "young woman" to describe Hannah, who was fourteen at the time of trial. She described Hannah's demeanor while testifying:

21

[Y]ou saw her on that stand. It's when she slumped down and she put her head down as she couldn't look you in the eye. That's humiliation. It's when she was grabbing those tissues and fighting slowly to tell you what happened, frame by frame. That's being degraded -- struggling up on that stand to get through it without breaking down.

That's the maturity of the [fourteen] year old now. That's not the maturity that she had when she was [eleven]. But, you saw the [eleven] year old up there telling you how in, literally minutes, this defendant climbed around and climbed through up on that bed.

Defense counsel did not object. The prosecutor then made several more comments indicating the jury should view Hannah as an eleven year old, including: "[Eleven] year old [Hannah] can't say vagina. [Eleven] year old [Hannah] says girl private parts"; and "it was [eleven] year old [Hannah] up there on that stand, looking down . . . , explaining where else or how else he touched her . . . with his mouth. What [eleven] year old knows anything about a man's mouth touching a vagina?"

Defendant argues that the prosecutor's "improper and prejudicial" remarks during summation "individually and cumulatively" deprived him of a fair trial. Defendant claims the prosecutor: (1) imposed her personal opinions on the jury; (2) disparaged a defense witness; (3) made comments not supported by the evidence; and (4) inflamed the passion of the jury.

All persons accused of crimes are guaranteed the right to a fair trial.  U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.  When a defendant alleges prosecutorial misconduct, we conduct a two-part analysis.  Wakefield, 190 N.J. at 446.  First, we must determine "whether the prosecutor committed misconduct."  Ibid.; see also Smith, 167 N.J. at 181.  Second, we "must decide whether the prosecutor's misconduct constitutes grounds for a new trial."  Smith, 167 N.J. at 181.  "In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial, we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred."  Timmendequas, 161 N.J. at 575.

Prosecutors are afforded "considerable leeway in closing arguments so long as their comments are reasonably related to the scope of the evidence presented."  Timmendequas, 161 N.J. at 587-88 (finding prosecutor's graphic description of the murder to be a "proper reconstruction" based on the evidence).  "Nevertheless, prosecutors also have the overriding obligation to see that justice is fairly done."  State v. Gregg, 278 N.J. Super. 182, 185, 187-88, 190 (App. Div. 1994) (reversing conviction for aggravated manslaughter, despite "more than sufficient" evidence to sustain the conviction, due to prosecutor's prejudicial statements in summation).

A-5299-15T3

"Prosecutors may not make inaccurate factual or legal assertions during summation . . . ." State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003) (finding misconduct when prosecutor referred to the victim as "an athletic young pretty mother of two children," which was not part of the trial testimony); see also Frost, 158 N.J. at 80-81, 84–85 (finding misconduct when prosecutor stated that "buy money" allegedly used in drug transaction was not presented at trial because it was "confiscated" and therefore inadmissible; statement was "not only inaccurate, [but] misleading"). Nor may prosecutors make comments "solely to inflame the jury and elicit passion." State v. Williams, 113 N.J. 393, 448, 457 (1988) (reversing murder conviction where prosecutor's guilt phase opening statement extolled the virtues of the victim and described her as "[filled with] such joy, such hope, such promise").

Furthermore, "[a] prosecutor is not permitted to cast unjustified aspersions" on the defense, or defense counsel's motives. State v. Lockett, 249 N.J. Super. 428, 432, 433-34 (App. Div. 1991) (reversing conviction where prosecutor stated defense counsel's strategy was to distract the jury from the evidence); see also Gregg, 278 N.J. Super. at 189, 191 (requiring new trial where prosecutor referred to defendant as "disgusting, a ninny, a buffoon, nasty, and violent, and using a whole slang dictionary's worth of demeaning

24

colloquialisms"). Lastly, a prosecutor may not "express his [or her] personal opinion on the veracity of any witness." State v. Rivera, 437 N.J. Super. 434, 463, 465 (App. Div. 2014) (reversing conviction where prosecutor's statement that "defendant is lying to you" was not supported by any evidence of contradiction, and prosecutor improperly opined that "the reality is [the State's witness] is not lying").

In sum, "prosecutors should confine their summations to a review of, and an argument on, the evidence, and not indulge in improper expressions of personal or official opinion as to the guilt of the defendant, or [otherwise engage] in collateral improprieties of any type, lest they imperil otherwise sound convictions." Frost, 158 N.J. at 88 (alteration in original) (quoting State v. Thornton, 38 N.J. 380, 400 (1962)).

Here, the prosecutor improperly inserted her personal opinion into the case – describing what she found "insulting," what she found "unacceptable," and what she found "personally offensive." See Jenkins, 299 N.J. Super. at 70. The judge corrected this expression of personal opinion once, but not every time it occurred. The prosecutor also injected herself inappropriately with respect to Danielle's failure to contact the police in 2012, telling the jurors that even the

prosecutor herself, with all of her education, power, and resources, might not have done "any better" than Danielle.

The prosecutor's reference to Danielle cleaning toilets "on her hands and knees" was also an over-dramatization of the testimony that Danielle cleaned houses, and the judge corrected the prosecutor.

Many of the allegedly inappropriate comments were responses to the defense summation. See State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996) (noting that "[a] prosecutor may respond to an issue or argument raised by defense counsel" because his or her "response to an issue injected by opposing counsel cannot be considered a foray beyond the evidence adduced at trial"); see also State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011) (finding that "[a] prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments"). The question is whether the prosecutor's inappropriate comments were "sufficiently egregious to deny defendant a fair trial." Rodriguez, 365 N.J. Super. at 48. In this case, the jury deliberated extensively, asking to review defendant's statement multiple times.

A reviewing court must look at the closing as a whole, not just isolated remarks. State v. Whittaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008); State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008); see also State v.

Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (explaining that the reviewing court should take into consideration tenor of trial, conduct of counsel, comments of defense, and conduct of court). Here, although the prosecutor stepped over the line in her summation, taken as a whole it did not deprive defendant of a fair trial, especially given the defense summation.

The errors alleged by defendant did not prejudice defendant, cut mortally into his substantive rights, or lead the jury to an outcome it may otherwise not have reached. See Macon, 57 N.J.at 335-36 (discussing the standard for harmless error).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION